IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| IN THE MATTER OF: ) | CASE NO.  BK05-85285 |
| ) | A06-8018 |
| RONALD & SHEILA JUEDEN, ) | |
| ) | CH. 7 |
| Debtors. ) | |
| FIRST NATIONAL BANK OF BELDEN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| RONALD & SHEILA JUEDEN, ) | |
| ) | |
| Defendants. ) | |

MEMORANDUM

Trial was held in Omaha, Nebraska, on September 11, 2006, on the plaintiff's complaint to determine dischargeability of a debt under 11 U.S.C. § 523(a)(6). Steven J. Woolley appeared on behalf of First National Bank of Belden, and Wanda Howey-Fox appeared on behalf of the debtors. This memorandum contains findings of fact and conclusions of law required by Federal Rule of Bankruptcy Procedure 7052 and Federal Rule of Civil Procedure 52. This is a core proceeding as defined by 28 U.S.C. § 157(b)(2)(I).

Findings of Fact

Debtors, doing business as J&H Swine, Inc., were engaged in hog production. They borrowed money from First National Bank of Belden ("Bank") to construct a farrowing building, related buildings, and a manure pit. They also borrowed money from the Bank for the hog operations. Over several years, beginning in 1997, the obligations owed to the Bank were renewed on an annual or semiannual basis. The debt was secured by a pledge of personal and corporate collateral.

Shortly after constructing the farrowing building and associated facilities, debtors determined that the construction of the farrowing building and related facilities was improperly performed. The farrowing facility did not have sufficient ventilation and therefore, in the summer heat, sows died, which left litters of pigs motherless, so they died as well. The losses of sows and new pigs reduced the breeding herd, thereby reducing the future pig crop.

Debtors sued the contractors, but eventually lost the lawsuits.

The arrangement between debtors and the Bank was for debtors to obtain operating loan advances deposited into their checking account at the Bank, pay for feed, utilities, maintenance, and

when the hogs were sold, deposit the checks into the same checking account at the Bank. As long as debtors' operating line had not reached its maximum, the Bank would continue to advance funds after applying some or all of the sale proceeds to the operating note.

In 1999, debtors attempted to obtain additional funds from the Bank for use in preparing the farrowing facility. However, the Bank declined to make further advances for that purpose.

As time went on, debtors were required to borrow a vehicle and some equipment from their son, Heath, and Heath advanced them money. Sometimes he directly paid for utilities and sometimes he delivered a check to debtors, which debtors deposited into their checking account at the Bank.

In May 2002, debtors failed to make an annual payment and were declared in default under the loans. The Bank did not call the loans due and payable, but continued to work with debtors to see if the financial situation could be salvaged. Debtors were still raising and selling hogs and still depositing checks into the account at the Bank. However, the Bank officers noticed that the proceeds that were deposited into the checking account did not seem to match the amount that should have been available from the sale of the number of pigs shown on the financial statements.

Debtors have provided the Bank with financial statements on an annual basis, the last of which was provided in May 2002.

In March 2003, when the Bank officer made an inspection of the premises and attempted to determine the number of head of hogs on hand, Mr. Jueden told the Bank officer that at least $21,000 worth of hogs on the premises belonged to his son Heath. Mr. Jueden then, and later, claimed that Heath had purchased the hogs by delivering one or more checks to debtors in 1999, and that as certain hogs were sold over the years, the proceeds were credited to Heath, because Heath had not taken possession of the hogs when purchased.

Upon learning of the alleged sale to Heath, and the claim that some of the inventory actually belonged to Heath although that fact had not been noted on any financial statement, the Bank called the notes due and payable. However, the Bank did not immediately take possession of the remaining inventory, but permitted debtors to remain in possession and continue to raise and sell hogs. The Bank eventually took possession of the remaining collateral in the spring of 2004. Thereafter, the Bank sued debtors and obtained a judgment for several hundred thousand dollars.

In October 2005, debtors filed Chapter 7 bankruptcy. The Bank filed this adversary proceeding requesting the court to determine that approximately $37,000 of debt was non-dischargeable under 11 U.S.C. § 523(a)(6) because the Bank had discovered that debtors, since 2001, had diverted hog sale proceed checks to their own personal account at a different bank rather than complying with the business banking arrangement agreed to by the parties.

At trial, Mr. Jueden testified that he believed he had a right to take some of the proceeds checks in payment for his services, and that he used the money for family purposes, as well as paying for electricity and other bills, including feed bills, to make certain that the hogs were

maintained. His position is that frequently the Bank refused to advance additional funds, even for the payment of feed or electricity to maintain the farrowing and related facilities in a condition to enable the hogs to be raised. Since the only way he could pay back the loans to the Bank was to raise hogs and sell them, he needed funds to assure that the hogs would stay alive long enough to be sold. Mr. Jueden also testified that some of the proceeds from the sale of the hogs actually belonged to Heath, because Heath owned some of the hogs. That is the reason why the checks were sometimes delivered to Heath for deposit in his own account.

The Bank's exhibit, Filing #84, is an itemization of checks for pig sale proceeds which were not deposited into the business account at the Bank. That exhibit shows that from May 4, 2001, through February 24, 2004, checks totaling $45,405.82 did not make it into the business account at the Bank. The Bank pursued payment from some of the purchasers and received a payment from Tyson Foods, doing business as Heinold, in the amount of $7,462.19. The balance remaining and the balance that the Bank desires to have found to be non-dischargeable is $37,943.63.

Filing #84 shows that from and after March 12, 2003, shortly after the Bank called the note due and payable, through February 2004, while debtors kept operating and kept possession of the hogs, more than $23,000 worth of proceeds were deposited by debtors or by Heath in accounts other than the business account at the Bank. Mr. Jueden explained that even though the Bank called the note, it left him in possession of the animals and he needed to take care of them. The only way he could do so was to use proceeds from the sale of hogs to purchase feed, pay the utilities, and pay his living expenses. He claimed that the Bank would not advance any funds once it called the note, but that it left him with the responsibility for taking care of the animals. He did so, arguably to the benefit of the Bank because the animals were kept alive and, when the Bank eventually decided to take possession of them, in 2004, there were animals that it was able to sell and apply the proceeds to the note.

It is Mr. Jueden's position that he had no interest in harming the Bank. He simply wanted to keep his business operating in the hope that things would get better, hog prices would increase, his facilities could be put in good enough repair to protect the pigs from early death loss, and that he would be able to pay off the loans to the Bank.

Conclusions of Law and Discussion

The Bankruptcy Code does not discharge a debtor from a debt for "willful and malicious injury by the debtor to another entity or to the property of another entity." § 523(a)(6). The United States Supreme Court has explained that non-dischargeability under this section is akin to an intentional tort, as it requires a "deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." Kawaauhau v. Geiger, 523 U.S. 57, 61 (1998).

In the Eighth Circuit, Kawaauhau has been interpreted to protect debtors when the harm caused to creditors, even though likely to occur, was unintentional. In Land O'Lakes Farmland Feed, L.L.C. v. Gehl (In re Gehl), 325 B.R. 269 (Bankr. N.D. Iowa 2005), a farmer contracted with Land O'Lakes to provide him with monthly shipments of weaned pigs for his operation. The arrangement

worked for several months, until the debtor received two shipments of pigs who had a higher-than-normal mortality rate. He believed Land O'Lakes shipped him sick pigs. The parties' contract provided that he could file a claim for price adjustment, but instead, after receiving no results from his complaints to company representatives, he withheld payment for two subsequent shipments. Land O'Lakes then won an arbitration award and the debtor filed his Chapter 7 petition. Land O'Lakes filed objections to discharge and dischargeability, including a § 523(a)(6) cause of action. The bankruptcy court denied it, finding the debtor's actions neither willful nor malicious. "Debtor took this action in an effort to negotiate a set-off and not to defraud [Land O'Lakes]. No matter how unfounded his belief that he was entitled to set-off for the increased loss rate of batches 22 and 24, Debtor's actions were not done with the intent to injure [Land O'Lakes]." 325 B.R. at 276.

In Wieberg v. Thompson (In re Thompson), 315 B.R. 94 (Bankr. W.D. Mo. 2004), the creditor sold cattle to the debtor and retained a security interest. Some of the cattle disappeared and were unaccounted for. Those remaining were sold and the proceeds paid to the creditor. The creditor then filed a non-dischargeability action as to the deficiency, alleging that the debtor willfully and maliciously converted his collateral. The bankruptcy court summarized the Barclays American/Business Credit, Inc. v. Long (In re Long), 774 F.2d 875 (8th Cir. 1985), decision (where debtor's actions in diverting funds were found to be willful but not malicious because he did not intend to harm the creditor – he simply wanted to save his business) as holding that "debtors who sell collateral out of trust, and then file for bankruptcy relief, must offer a valid, and credible, explanation for their actions if the resulting debt is to be discharged." 315 B.R. at 106. The court found, however, that the Thompsons had no reasonable explanation for the cattle's disappearance and declared the debt non-dischargeable.

In Brown v. Heister (In re Heister), 290 B.R. 665 (Bankr. N.D. Iowa 2003), a retired farmer sold antique tractors to the debtor for the debtor to fix up and sell. The plaintiff would set the sale price and the debtor could keep any proceeds above that. Eventually, the debtor stopped sending the proceeds to the plaintiff. When the debtor filed bankruptcy, the plaintiff filed a non-dischargeability complaint. The bankruptcy court found that the debtor's conduct in withholding payments was willful, but was not malicious because he used the money to pay other expenses to try to keep going. His conduct was not targeted at the plaintiff.

Likewise, in the unpublished case of First State Bank v. Caruth (In re Caruth), 2002 WL 1770523 (Bankr. N.D. Iowa July 30, 2002), the debtor sold some of the bank's collateral and used the money to pay child support and living expenses. The court found this did not constitute "willful and malicious conduct" because it was not done with the intent of causing the bank harm.

There is no question that the diversion of the proceeds checks was willful. Debtors knew that the checks were collateral of the Bank and knew that the practice between the Bank and debtors was to deposit all proceed checks into the business account. Debtors intentionally diverted many of those checks for their own use. The checks which were diverted to Heath were also diverted willfully. There is no evidence that the Bank at any time prior to March 10, 2003, knew that Heath had purchased animals back in 1999, and that Mr. Jueden was picking and choosing which hogs were being sold for the benefit of Heath.

The case law provides that in order for the Bank to prevail on an adversary proceeding under 11 U.S.C. § 523(a)(6) it must prove that Mr. Jueden intended to cause harm to the Bank. That is, the Bank must prove not only that the proceeds were diverted, but that such diversion was intended to cause the Bank a loss. Mr. Jueden did take the proceeds. However, he used the proceeds for normal operations and did so when the Bank refused to advance additional funds. He was responsible for maintaining and taking care of the hogs, and he used the funds for feed and utility bills. Such use benefitted the Bank in that when the whole business collapsed, the Bank still had some inventory that it could liquidate. It cannot be found that Mr. or Mrs. Jueden intended to harm the Bank by the manner in which they used the funds. They did it to keep the business operating and to protect the animals.

If Congress had intended § 523(a)(6) to be applicable every time property was converted, it could have specifically said so in the statutory language. If the Supreme Court had interpreted that statutory section to mean that every conversion creates a non-dischargeable debt, it would not have decided Kawaauhau as requiring intent to cause injury before the statutory section is applicable.

The actions of the debtors were willful but not intentional as that term has been defined under 11 U.S.C. § 523(a)(6). Separate judgment shall be entered in favor of the debtors.

DATED: October 24, 2006

BY THE COURT:

 /s/ Timothy J. Mahoney
Chief Judge

Notice given by the court to:
    Wanda Howey-Fox
    *Steven J. Woolley
    United States Trustee

Movant(*) is responsible for giving notice to other parties if required by rule or statute.